**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BENJAMIN WITTES<br>P.O. Box 33226<br>Washington, D.C. 20033-3226,<br><br>SCOTT R. ANDERSON<br>P.O. Box 33226<br>Washington, D.C. 20033-3226, *and*<br><br>PROTECT DEMOCRACY PROJECT, INC.<br>2020 Pennsylvania Avenue NW<br>Suite 163<br>Washington, D.C. 20006,<br><br>*Plaintiffs*,<br><br>*vs.*<br><br>DONALD J. TRUMP, *in his official capacity<br>as President of the United States*<br>1600 Pennsylvania Avenue NW<br>Washington, D.C. 20500,<br><br>*Defendant.* | Case No. |

**COMPLAINT FOR DECLARATORY RELIEF AND
PETITION FOR WRIT OF MANDAMUS**

Plaintiffs Benjamin Wittes, Scott R. Anderson, and Protect Democracy Project, Inc.

("Protect Democracy"), by and through undersigned counsel, hereby allege as follows:

**INTRODUCTION AND SUMMARY OF THE ACTION**

1.      Plaintiffs bring this action to compel Defendant Donald J. Trump to comply with

his clear, nondiscretionary duty to publish the report required by 50 U.S.C. § 1549, regarding the

legal and policy frameworks for the United States Government's use of military force ("War

Powers Transparency Report"). Without the President's prompt compliance with his overdue

statutory duty, Plaintiffs, the American people, and Congress are denied the opportunity to participate meaningfully in one of the most critical policy debates a nation must have—when, how, and under what legal authority may it engage in the use of military force.

2.      For nearly two decades, the United States Government has engaged in an expansive military effort to establish stable and democratic regimes in Afghanistan and Iraq and cripple international terror networks in Asia and Africa. This extended global war has touched every American: the United States has spent more than $1 trillion in this effort, and more than 10,000 Americans have sacrificed their lives.[1] The appropriate scope of this extended military effort has been one of the most important American public policy debates of this century.

3.      In recognition of the public's vital need for information about the Executive Branch's interpretation of its authority in this area, Congress enacted a law, codified at 50 U.S.C. § 1549, requiring the President annually to "submit to the appropriate congressional committees a report on the legal and policy frameworks for the United States' use of military force and related national security operations," and instructing that the "unclassified portion of [the] report . . . shall be made available to the public at the same time it is submitted" to Congress.

4.      Under that statute, President Trump was required to publish the War Powers Transparency Report no later than March 1, 2020. He has failed to do so. This failure has inhibited Plaintiffs, two national security scholars, and a nonprofit organization that, among other things, educates the public about the operations of the United States Government, from fulfilling their objectives of analyzing and informing the public about the Executive Branch's understanding of its war powers authorities.

---

[1] *See* Christopher T. Mann, Cong. Res. Serv., IF11182, *U.S. War Costs, Casualties, and Personnel Levels Since 9/11* ("U.S. War Costs Report"), at 2 (Apr. 18, 2019) at 2, available at https://fas.org/sgp/crs/natsec/IF11182.pdf.

5.      Accordingly, Plaintiffs now bring this Complaint, in which they respectfully request that the Court issue (i) a writ of mandamus directing the President to comply with 50 U.S.C. § 1549 and publish the War Powers Transparency Report, and (ii) an order declaring the President in violation of the law, so that the public can meaningfully participate in the debate over the scope of the Executive's authority to use military force.

## PARTIES

6.      Defendant DONALD JOHN TRUMP is President of the United States and the official subject to the requirement, codified at 50 U.S.C. § 1549, to publish the War Powers Transparency Report. President Trump is sued in his official capacity.

7.      Plaintiff BENJAMIN WITTES is a legal journalist and author with an expertise in national security law and the separation of powers. He resides in Washington, D.C., and his professional activities occur primarily in Washington, D.C.

8.      Mr. Wittes co-founded and is the editor-in-chief of *Lawfare*, an online magazine published by The Lawfare Institute, a 501(c)(3) not-for-profit educational organization. *Lawfare* is published in cooperation with The Brookings Institution, a 501(c)(3) not-for-profit public policy organization. *Lawfare* is dedicated to educating the public about national security law and policy as well as integrity in national security decision-making, and Mr. Wittes specifically researches and writes about issues related to national security and terrorism, including matters that are the subject of the War Powers Transparency Report. He is also a senior fellow in Governance Studies at The Brookings Institution, a contributing writer at *The Atlantic*, and a legal analyst at NBC News and MSNBC. He regularly teaches a course on writing about the law for general audiences at Harvard Law School. Prior to founding *Lawfare*, Mr. Wittes served as an editorial writer for *The Washington Post* from 1997 to 2006, specializing in legal affairs.

Earlier, he covered the Justice Department and federal regulatory agencies as a reporter and news editor at *Legal Times*.

9.      Plaintiff SCOTT RICHARD ANDERSON is an author, lawyer, and academic with expertise in national security law, with a particular focus on the legal limits of the Executive Branch's war powers authorities. He resides in Washington, D.C., and his professional activities occur primarily in Washington, D.C., and New York, N.Y.

10.     Mr. Anderson's primary professional objective is contributing to the debate among the American public, and among fellow experts in the field, on United States national security law and policy decisions. Since 2017, he has served as a Senior Editor and Counsel at *Lawfare* and The Lawfare Institute, the not-for-profit educational organization that operates *Lawfare*.  He is also a Visiting Fellow in Governance Studies at The Brookings Institution in Washington, D.C., and a Senior Fellow in the National Security Law Program at Columbia Law School, where he co-teaches a course on constitutional war powers.

11.     Previously, Mr. Anderson spent nearly five years as an attorney-adviser in the U.S. Department of State's Office of the Legal Adviser, the office responsible for providing advice to State Department policymakers on issues of domestic and international law. Much of his tenure at the State Department was focused on legal advice relating to issues facing the United States in the Middle East.  He spent a year as the legal advisor for the U.S. Embassy to the Republic of Iraq, where he served as the U.S. Ambassador's legal advisor on all matters of domestic and international law, and a member of the Embassy's leadership team. Since leaving the State Department, Mr. Anderson has, among other positions, served as an Associate at the Harvard Kennedy School's Belfer Center for Science and International Affairs, a Research

Fellow at the Harvard Law School Program on International Law and Armed Conflict, and an International Affairs Fellow at the Council on Foreign Relations.

12.     Plaintiff PROTECT DEMOCRACY PROJECT, INC. is a 501(c)(3) not-for-profit, nonpartisan organization, organized under the laws of and headquartered in Washington, D.C.

13.     Protect Democracy's mission is to protect American democracy from descending into a more autocratic form of government by preventing those in power from depriving Americans of a free, fair, and fully informed opportunity to participate in democracy. As part of this mission, Protect Democracy seeks to inform public understanding of the operations and activities of government by gathering and disseminating information that is likely to contribute significantly to the public's understanding of Executive Branch operations and activities. Within its broader mission of protecting democratic government, Protect Democracy has given special attention to oversight of, and public education and advocacy about, the President's exercise of his war powers authorities.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which grants original jurisdiction to the district courts of "all civil actions arising under the Constitution, laws, or treaties of the United States." The Court further has jurisdiction pursuant to 28 U.S.C. § 1361, which grants original jurisdiction to the district courts of "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1), because Defendant resides within this judicial district; a substantial part of the events or omissions giving rise to the claim occurred within this judicial district; Plaintiff Protect Democracy's principal

place of business is within this judicial district; and Plaintiffs Mr. Wittes and Mr. Anderson

reside within this judicial district.

## FACTUAL ALLEGATIONS

### I.    Historical Background

16.    While the power to declare war is constitutionally committed to Congress, *see*

U.S. Const. art. I, § 8, Presidents have long asserted that they have inherent authority to take at

least limited military action to defend the country, respond to emergencies, and defend American

lives and interests abroad, among other purposes.

17.    After the terrorist attacks of September 11, 2001, Congress twice provided the

President with authorization to use military force. First, Congress passed (and the President

signed into law) the Authorization for Use of Military Force of 2001 ("2001 AUMF"), Pub. L.

No. 107-40, 115 Stat. 224, which authorized the President to use

> all necessary and appropriate force against those nations, organizations, or
> persons he determines planned, authorized, committed, or aided the terrorist
> attacks that occurred on September 11, 2001, or harbored such organizations or
> persons, in order to prevent any future acts of international terrorism against the
> United States by such nations, organizations or persons.

2001 AUMF, § 2(a).

18.    Second, the following year, Congress passed, and the President signed, the

Authorization for Use of Military Force Against Iraq Resolution of 2002 ("2002 AUMF"), Pub.

L. No. 107-243, 116 Stat. 1498, which authorized the President, in relevant part, to "use the

Armed Forces of the United States as he determines necessary and appropriate in order to defend

the national security of the United States against the continuing threat posed by Iraq." 2002

AUMF, § 3(a).

19.    Since the passage of the 2001 and 2002 AUMFs, the scope of the American

military effort to combat international terrorism and promote stability in Iraq has depended upon

the Executive Branch's interpretations of these grants of authority from Congress and the Constitution. These interpretations have evolved and shifted over time, both within Presidential Administrations and between Administrations.

20.     At various points, the Executive Branch has interpreted the 2001 and 2002 AUMFs to authorize, in whole or in part, troop deployments or military actions not only in Afghanistan and Iraq, but also in Africa's Lake Chad Basin and Sahel Region, Cameroon, Cuba, Djibouti, Georgia, the Horn of Africa, Jordan, Lebanon, Libya, Niger, the Philippines, Somalia, Syria, Turkey, the United Arab Emirates, and the high seas.[2]

21.     At times, the Executive Branch has also interpreted the 2001 and 2002 AUMFs to authorize subjecting enemy combatants to conduct that arguably constitutes torture; and to use targeted lethal force against suspected terrorists, including American citizens, and in areas with substantial risks of collateral civilian casualties.

22.     Pursuant to the 2001 and 2002 AUMFs, the United States has taken military action against not only al-Qaeda, but also a variety of al-Qaeda offshoots that did not exist in their current form at the time of the 2001 AUMF's passage, such as al-Qaeda in the Arabian Peninsula, al-Qaeda in Libya, and al-Qaeda in Syria. It has also taken action against al-Shabaab in East Africa, and the Islamic State of Iraq and the Levant (ISIL), neither of which existed at the time of passage of the original AUMFs.

23.     Presidents have also invoked their inherent authority under Article II of the Constitution, *see* U.S. Const. art. II, § 2, to take a variety of military actions absent congressional authorization. For example, President Obama authorized military force in Libya in 2011 pursuant

---

[2] *See* Matthew Weed, Cong. Res. Serv., *Presidential References to the 2001 Authorization for Use of Military Force in Publicly Available Executive Actions and Reports to Congress* (Feb. 16, 2018), available at https://fas.org/sgp/crs/natsec/pres-aumf.pdf.

to the President's inherent Article II authority to advance U.S. national security and foreign policy interests, as well as in Yemen in 2016 pursuant to his Article II authority to retaliate in response to a missile attack. In 2017, President Trump ordered missile strikes against the al-Shayrat airfield in Syria, asserting that retaliation for chemical weapons use was in the U.S. national interest; in 2018, he ordered strikes against facilities in Syria believed to produce chemical weapons using similar Article II authority.

24.     Most recently, President Trump ordered the lethal targeting of high-ranking Iranian government official Major General Qassem Soleimani, a step previously considered and rejected by Presidents Bush and Obama in part because of the likelihood that it would result in open war between the United States and Iran.[3] The Trump Administration thereafter asserted that the authority for this killing—which took place in Iraq—derived from the 2002 AUMF and the President's Article II powers to protect U.S. forces.

25.     The suggestion that the President has existing authority to take actions that could lead directly to open war with another sovereign nation reflects a broad understanding of the authority granted by the 2002 AUMF and Article II of the Constitution. In addition, statements by President Trump suggest that he disagrees with common understandings of domestic or

---

[3] *See, e.g.*, Stanley McChrystal, *Iran's Deadly Puppet Master*, Foreign Policy, Winter 2019, available at https://foreignpolicy.com/gt-essay/irans-deadly-puppet-master-qassem-suleimani/ (Gen. McChrystal, who led the U.S. Joint Special Operations Command from 2003 to 2008 and served as commander of U.S. and NATO forces in Afghanistan in 2009 and 2010 described declining an opportunity to assassinate Soleimani in 2007 to "avoid a firefight, and the contentious politics that would follow"); Christopher Dickey et al., *Why Obama, Bush, and Bibi All Passed on Killing Soleimani*, Daily Beast, Jan. 3, 2020, available at https://www.thedailybeast.com/why-obama-bush-and-bibi-all-passed-on-killing-qassem-soleimani (U.S. officials during the Obama administration could not "begin to be sure what would come next if Soleimani were killed"; Israeli officials said they had been asked by the Obama administration not to kill Soleimani because "the implications could be much greater than a localized war, the repercussions could affect the whole world").

international law regarding the conduct of hostilities.  For example, he has called for the targeted killing of family members of suspected terrorists, threatened the deliberate destruction of cultural sites in Iran, and explicitly threatened "disproportionate" strikes against Iran. These statements further underscore the need for the public to have a greater understanding of the Executive Branch's interpretation of the legal limitations on its use of military force, including as to the conduct of hostilities.

## II.   Efforts to enhance transparency into Executive Branch interpretations of its legal authority to use military force

### A.   The importance of public transparency

26.     Without a full view of the Executive Branch's interpretation of its legal authority to use military force, the American public and members of Congress are unable to effectively consider, analyze, debate, and, as they deem appropriate, act, including through elections, oversight, and legislation, to modify the scope of that authority, as the Executive Branch understands it.

27.     As the United States' conduct of global military operations has expanded and evolved since 2001, the Executive Branch has periodically released explanations of its legal basis for opening new fronts.  The Executive Branch has done so in a variety of ways, sometimes through speeches or interviews; other times through disclosure of memoranda or "white papers"; and at other times, through congressional notification by the White House as required under the War Powers Resolution, 50 U.S.C. §§ 1541–1548, to alert the public to new legal interpretations.

28.     Prior to 2016, these piecemeal, voluntary disclosures formed the entirety of the public's window into the Executive Branch's understanding of the scope of its legal authority to use military force. Mr. Wittes co-authored a book in 2015 that attempted to distill the various legal positions taken in speeches by Obama administration officials into a comprehensive

estimate of what President Obama believed to be the scope of presidential war powers authorities[4]; such an estimate, at the time, did not otherwise exist in public.

29.     Absent thorough and judicious research across a multitude of official writings, congressional testimony, public speeches, and leaked memoranda, members of the public have generally lacked the ability to make an informed assessment of the Executive Branch's understanding of its authority to use military force.

30.     Without information about the Executive Branch's interpretation of its war powers authorities, the public is unable to hold the government fully to account for its national security choices. This is the case even though Americans are directly affected by these choices— through the expenditure of over $1 trillion from the public fisc; the sacrifice of over 10,000 American lives;[5] the deaths of innocent civilians abroad; and the risk of retaliatory violence to which American lives and interests are subjected.[6]

31.     This lack of transparency also threatens Congress's ability to engage with and potentially constrain the President's legal authority to use military force. Congress can more effectively tailor approvals of or limitations on the President's authority when the President has explained what he believes the scope and contours of that authority to be.

---

[4] Kenneth Anderson & Benjamin Wittes, *Speaking the Law: The Obama Administration's Addresses on National Security Law* (2015).

[5] U.S. War Costs Report at 1–2.

[6] For example, American companies and non-profit organizations and their employees were taken by surprise by the January 2020 killing of Major General Qassem Soleimani, and the rapid subsequent escalation in tensions between the United States and Iran, discussed further below, forced some of them to rapidly wind down operations and evacuate American workers. *See* Hanna Ziady, *US Oil Workers Are Leaving Iraq. Exxon Mobil has Operations There,* CNN Business, Jan. 3, 2020, available at https://www.cnn.com/2020/01/03/business/us-oil-company-workers-leaving-iraq/index.html; Michael Igoe, *In Wake of US-Iran Clash, Aid Groups Fear Access, Security Blowback,* Devex, Jan. 16, 2020, available at https://www.devex.com/news/in-wake-of-us-iran-clash-aid-groups-fear-access-security-blowback-96361.

**B.      The 2016 War Powers Transparency Report**

32.      In December 2016, the Obama Administration released the most thorough recent

public accounting of the Executive Branch's interpretation of its war powers authorities and their

limits, the *Report on the Legal and Policy Frameworks Guiding the United States' Use of

Military Force and Related National Security Operations* ("2016 War Powers Transparency

Report" or "2016 Report").[7]

33.      President Obama explained in the Foreword to the 2016 War Powers

Transparency Report that

> Decisions regarding war and peace are among the most important any President
> faces. It is critical, therefore, that such decisions are made pursuant to a policy
> and legal framework that affords clear guidance internally, reduces the risk of an
> ill-considered decision, and enables the disclosure of as much information as
> possible to the public, consistent with national security and the proper functioning
> of the Government, so that an informed public can scrutinize our actions and hold
> us to account.[8]

34.      Along with the Report, President Obama issued a Presidential Memorandum

encouraging "future Administrations to build on this report and carry forward the principles of

transparency it represents."[9] The memorandum further stated that the National Security Council

staff "shall be asked, as appropriate, to update the report at least on an annual basis and to

arrange for the report to be released to the public."[10]

35.      The 2016 Report described President Obama's approach to evaluating the

Executive Branch's war powers, including disclosing the rationales for expansive interpretations

of authority outside of Afghanistan, Iraq, and the fight against al-Qaeda; listed the countries in

---

[7] Available at
https://obamawhitehouse.archives.gov/sites/whitehouse.gov/files/documents/Legal_Policy_Repo
rt.pdf.
[8] *Id.* at i.
[9] *Id.* at ii.
[10] *Id.*

which the United States was using military force and articulating the legal authority relied on for each theater; and revealed the precise ways in which the Obama Administration interpreted the authorities granted by the AUMFs and the Constitution.

36.     The 2016 War Powers Transparency Report also contained thorough articulations of the legal and policy frameworks guiding and constraining the Executive Branch's conduct of war, including an explanation of the Executive Branch's efforts to minimize and disclose civilian casualties as required by Executive Order 13,732.

37.     The Executive Branch's interpretations of its war powers authorities are not self-evident or obvious, even to an expert in the field.  Indeed, absent an explanation from the Executive Branch of the type provided by the War Powers Transparency Report, members of the public and Congress would frequently be—and have frequently been— reduced to educated guesses as to when, where, why, and against whom the President legally believes he may deploy American military force.

**C.     Efforts to regularize the disclosure of the legal and policy frameworks governing the President's deployment of military force abroad**

38.     After President Trump took office in January 2017, it was unclear whether he would voluntarily follow the prior Administration's recommendation that the War Powers Transparency Report be updated and released at least annually by the National Security Council staff going forward. As the end of 2017 approached, the Trump Administration had not indicated that it would seek to inform Congress or the public of any updates to the legal and policy frameworks the new President used in determining the scope of his war powers authorities.

39.     In December 2017, Congress passed (and the President signed into law) the 2018 National Defense Authorization Act ("2018 NDAA"), Pub. L. No. 115-91, 131 Stat. 1283, section 1264 of which required that the Executive Branch update and report on changes to the

legal and policy frameworks for the U.S. use of military force and related national security operations.

40.     The 2018 NDAA directed the President to "submit to the appropriate congressional committees a report on the legal and policy frameworks for the United States' use of military force and related national security operations" within 90 days. *Id.* § 1264(a)(1). It further required the report to "include the legal, factual, and policy justifications for any changes made to such legal and policy frameworks during the period beginning on January 20, 2017, and ending on the date the report is submitted." *Id.* § 1264(a)(2).

41.     Going forward, Congress stated that "the President shall notify the appropriate committees" of any "change [to the legal and policy frameworks], including the legal, factual, and policy justification for such change" within 30 days. *Id.* § 1264(b).

42.     Finally, Congress required that the report be submitted in unclassified form but stated that it "may contain a classified annex." *Id.* § 1264(c).

43.     In response, in March 2018, the Trump administration published its first update to the War Powers Transparency Report.[11]

44.     Notably, rather than publish the update for public consumption as President Obama had done, the Trump Administration chose to transmit it only to Congress. Mr. Anderson and Allison Murphy of Protect Democracy were the first to report publicly on its contents, and the report was later leaked to the public.[12]

---

[11] The White House, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations* (Mar. 12, 2018), available at https://www.lawfareblog.com/document-white-house-legal-and-policy-frameworks-use-military-force.

[12] *See* Allison Murphy & Scott R. Anderson, *We Read the New War Powers Report So You Don't Have To,* Lawfare, Mar. 14, 2018, available at https://www.lawfareblog.com/we-read-new-war-powers-report-so-you-dont-have.

45.     The March 2018 update disclosed that the Trump Administration had left in place a number of legal interpretations articulated in the 2016 War Powers Transparency Report, but provided additional clarifications about President Trump's exercise of war powers authorities and associated legal justifications.

### D.     Developments between March 2018 and December 2019

46.     Since the Trump Administration's March 2018 update to the Report, a number of developments have called into question whether the Administration's evolving understanding of the constraints on the Executive Branch's power is accurately reflected in the 2016 Report and March 2018 update.

47.     On April 13, 2018, President Trump directed a series of airstrikes against facilities in Syria associated by the Administration with chemical weapons production. The following month, the Justice Department's Office of Legal Counsel published an opinion concluding that the President had inherent constitutional authority to order these strikes, explaining that President Trump had "reasonably determined that this operation would further important national interests" and because "the anticipated nature, scope, and duration of the operations were sufficiently limited that they did not amount to war in the constitutional sense and therefore did not require prior congressional approval."[13]

48.     On March 6, 2019, President Trump issued Executive Order No. 13,862, 84 Fed. Reg. 8,789, revoking the section of Executive Order No. 13,732 that committed the government to annual public reporting on civilian casualties. On May 28, 2019, President Trump transmitted a belated notice of that policy change to Congress pursuant to the 2018 NDAA's requirement

---

[13] Off. of Legal Counsel, U.S. Dep't of Just., *April 2018 Airstrikes Against Syrian Chemical-Weapons Facilities* (May 31, 2018), available at https://www.justice.gov/olc/opinion/file/1067551/download.

that the President inform Congress of changes to the legal and policy frameworks for the United

States' use of military force within 30 days.

49.     On June 28, 2019, in response to an inquiry about the Trump Administration's

claimed authority to use military force against Iran, the State Department's Assistant Secretary

for Legislative Affairs, Mary Taylor, wrote that "the Administration has not, *to date*, interpreted

either AUMF as authorizing military force against Iran, except as may be necessary to defend

U.S. *or partner forces* engaged in counterterrorism operations or operations to establish a stable,

democratic Iraq" (emphasis added).[14]

50.     Assistant Secretary Taylor's letter represented a shift from the 2016 War Powers

Transparency Report and March 2018 update, which only indicated that the Executive Branch

interpreted the 2001 AUMF, not the 2002 AUMF, to authorize military action to defend partner

forces from third-party attacks.

### E.     Congress's renewed effort to regularize disclosure of the War Powers Transparency Report

51.     In December 2019, Congress passed the 2020 National Defense Authorization

Act ("2020 NDAA"), Pub. L. No. 116-92, 133 Stat. 1198,which strengthened the requirement for

transparency concerning Executive Branch interpretations of its legal authorities for the use of

military force.

52.     The 2020 NDAA amended the provision first set forth in the 2018 NDAA to

require that the President submit an annual War Powers Transparency Report "[n]ot later than

---

[14] Letter from Mary Elizabeth Taylor, U.S. Dep't of State Assistant Sec'y, Bureau of Legis. Aff., to The Honorable Eliot L. Engel, Chairman, Comm. on Foreign Aff., U.S. House of Representatives (June 28, 2019), available at https://foreignaffairs.house.gov/_cache/files/8/4/84c1fa85-94cf-43c8-84a1-472972ec9c11/CCDEB9BD152E93A97B89332218E2A89C.aumf.pdf.

March 1 of each year." *Id.* § 1261(2), *codified at* 50 U.S.C. § 1549(a)(1) ("War Powers Reporting Requirement").

53.     As amended by the 2020 NDAA, the War Powers Reporting Requirement provides that the War Powers Transparency Report must include several specific pieces of information, including (i) "the legal, factual, and policy justifications for any changes made to such legal and policy frameworks" for the preceding year; (ii) "a list of all foreign forces, irregular forces, groups, or individuals for which a determination has been made that force could legally be used under the Authorization for Use of Military Force (Public Law 107-40)"; and (iii) "the criteria and any changes to the criteria for designating a foreign force, irregular force, group, or individual as lawfully targetable, as a high value target, and as formally or functionally a member of a group covered under the Authorization for Use of Military Force." 50 U.S.C. § 1549(a)(2).

54.     Importantly, the War Powers Reporting Requirement provides that the legal, factual, and policy justifications for changes made to the legal and policy frameworks governing hostilities disclosed in the War Powers Transparency Report "shall be made available to the public at the same time it is submitted to the appropriate congressional committees." 50 U.S.C. § 1549(c).

### F.     Escalating tensions with Iran in 2020

55.     On January 2, 2020, American forces targeted and killed Major General Qassem Soleimani, the leader of Iran's Quds Force of the Islamic Revolutionary Guards Corps, and considered the second most powerful person in Iran, in a drone strike in Iraq authorized by President Trump.[15] The decision to kill a senior Iranian official was a momentous one; during the

---

[15] *See* Michael Crowley et al., *U.S. Strike in Iraq Kills Qassim Suleimani, Commander of Iranian Forces*, N.Y. Times, Jan. 2, 2020, available at

Obama and Bush Administrations, the targeted killing of Soleimani was considered and explicitly rejected due to concerns that it would risk escalation of hostilities in the Middle East, and potentially open war between the United States and Iran.[16]

56.     In the aftermath of Soleimani's death, Iranian Ayatollah Khamenei vowed "severe revenge" against America for the killing,[17] and the State Department immediately advised all Americans in Iraq to depart the country immediately due to the threat of Iranian retribution. Within days, the Iranian government began firing missiles at military bases in Iraq housing U.S. troops.[18]

57.     On January 31, 2020, the President gave notice to Congress "of a change in application of the existing legal and policy frameworks since the last comprehensive update" to the War Powers Transparency Report, pursuant to the 2018 and 2020 NDAAs, relating to the killing of Soleimani.[19]

58.     In the notice, the President asserted the authority under Article II to "direct the use of military force to protect the Nation from an attack or threat of imminent attack and to

---

https://www.nytimes.com/2020/01/02/world/middleeast/qassem-soleimani-iraq-iran-attack.html; *Qasem Soleimani: Iran Vows 'Severe Revenge' for Top General's Death*, BBC News, Jan. 3, 2020, available at https://www.bbc.com/news/world-middle-east-50986185.

[16] *See, e.g.*, McChrystal, *Iran's Deadly Puppet Master*; Dickey et al., *Why Obama, Bush, and Bibi All Passed on Killing Soleimani*.

[17] *Qasem Soleimani: Iran Vows*, BBC News.

[18] *See* Courtney Kube & Doha Madani, *Iran Retaliates for Gen. Soleimani's Killing by Firing Missiles at U.S. Forces in Iraq*, NBC News, Jan. 7, 2020, available at https://www.nbcnews.com/news/world/u-s-base-iraq-comes-under-attack-missiles-iran-claims-n1112171.

[19] Press Release, The White House, Text of a Letter from the President to Certain Chairmen and a Chairwoman of House and Senate Committees (Jan. 31, 2020), available at https://www.whitehouse.gov/briefings-statements/text-letter-president-certain-chairmen-chairwoman-house-senate-committees/. The report was made public on February 14, 2020. *See, e.g.*, Catie Edmondson, *White House Memo Justifying Suleimani Strike Cites No Imminent Threat*, N.Y. Times, Feb. 14, 2020, available at https://www.nytimes.com/2020/02/14/us/politics/white-house-memo-suleimani-strike.html.

protect important national interests."[20] Notably, the President did not acknowledge the limitation

(included in the Department of Justice Office of Legal Counsel's 2018 opinion about strikes

against Syria) that the Article II authority to initiate military action absent congressional

approval may not extend to situations where a substantial risk of escalation causes the anticipated

nature, scope, and duration of the operations to rise to the level of a war in the constitutional

sense.

59.     To the extent the President's notice to Congress asserted the authority to kill

Soleimani under the 2002 AUMF, the notice was ambiguous as to whether this authority was

being used only for self-defense (to protect U.S. troops in Iraq under the 2002 AUMF), for

collective self-defense (of U.S. partner forces in Iraq under the 2002 AUMF), or for the broader

purpose of building a "stable, democratic Iraq."

III.    **President Trump's failure to comply with the 2020 NDAA**

60.     The President was required to submit the War Powers Transparency Report for

Fiscal Year 2020 to the appropriate congressional committees no later than March 1, 2020. *See*

50 U.S.C. § 1549(a). He was also required to make the unclassified portion of that report—which

is required to include "at a minimum . . . each change made to the legal and policy frameworks

during the preceding year and the legal, factual, and policy justifications for such changes"—

available to the public at the same time. 50 U.S.C. § 1549(c). These duties are clear and

nondiscretionary.

61.     By the President's own admission, he has made at least two changes to these legal

and policy frameworks in the year prior to March 1, 2020. On May 28, 2019, he notified

Congress of the March 6 partial revocation of Executive Order 13,732 by Executive Order

---

[20] The White House, Text of a Letter (Jan 31, 2020).

13,862, and expressly indicated that he was providing that notice pursuant to his obligation to inform them "[n]ot later than 30 days after the date on which a change is made to the legal and policy frameworks" under section 1264(b) of the 2018 NDAA.[21] Similarly, on January 31, 2020, he notified Congress that he was "transmitting notice on a change made to the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations" in accordance with section 1264 of the 2018 NDAA.[22] The cover letters providing these notifications to Congress are posted on the White House website, though neither notice is provided in full. The House Foreign Affairs Committee later released the unclassified portion of the January 31 notice to the public, revealing that it related to the killing of Qassem Soleimani.

62.     These two notifications and the update provided in March 2018 are the only reports the House Foreign Affairs Committee has received from the Trump Administration pursuant to the War Powers Reporting Requirement.

63.     Additionally, by claiming that the 2002 AUMF authorized the use of force in collective self-defense with partner forces, President Trump articulated an authority that was not claimed in the 2016 Report or 2018 update. This constitutes a change to the legal and policy frameworks and should be included in the War Powers Transparency Report that was due by March 1, 2020.

64.     To the extent that the Trump Administration has made any other change to the legal and policy frameworks during the 12 months prior to March 1, 2020 that have not yet been

---

[21] *See* Press Release, The White House, Text of a Letter from the President to Selected Congressional Committee Leadership (May 28, 2019), available at https://www.whitehouse.gov/briefings-statements/text-letter-president-selected-congressional-committee-leadership/.

[22] Press Release, The White House, Text of a Letter (Jan. 31, 2020).

publicly disclosed or reported, those should also be included in the required War Powers
Transparency Report that was due by March 1, 2020.

65.     As of the date of filing this Complaint, the President has not complied with the
War Powers Reporting Requirement, to the detriment of Plaintiffs, the American public, and
Congress.

## IV.     Harm to Plaintiffs

66.     Plaintiffs in this case are scholars and lawyers whose professional mission
includes studying the evolving scope of the Executive Branch's national security powers, and
conveying their understanding to the public so that the public can know more about their elected
officials and these officials' management of American military operations. Indeed, a primary
professional objective of each Plaintiff is to educate and inform the American public on issues
relating to national security law and policy, including for the purpose of enhancing American
participatory democracy with respect to those issues.

67.     For years, Plaintiffs have carefully parsed almost every sentence written or
spoken by Executive Branch leaders about the scope of the President's war powers, identifying
small shifts in the Executive Branch's carefully crafted language that potentially signal sea
changes in the authority a President may claim for themself.  Plaintiffs then use their
understanding to educate the American people about the scope of the military actions a President
may undertake in their name, and the risks a President may be taking on their behalf.

68.     For each Plaintiff, accomplishment of that objective has been severely inhibited
by the President's failure to comply with his legal duty to publish the War Powers Transparency
Report.

69.     Mr. Wittes has written and continues to write extensively about the issues
underlying this case, namely, the legal authorities that enable or constrain the President,

particularly in the realm of national security. Indeed, the term "Lawfare" as used by Mr. Wittes

to describe the work of his publication, "refers both to the use of law as a weapon of conflict and,

perhaps more importantly, to the depressing reality that America remains at war with itself over

the law governing its warfare with others."[23]

70.     When the Obama Administration first published the 2016 War Powers

Transparency Report, Mr. Wittes analyzed it in *Lawfare*, noting at the time that the report

> brings together in one document for the first time major legal positions related both to the use of force overseas and major positions related to such conduct-of-hostilities issues as targeting, interrogation, and detention. The document integrates the administration's domestic and international law positions and thus offers the clearest, most holisitic view yet of the legal framework for American overseas operations. Its publication will help in the process of what Ken and I call in the book "institutionalization" and "institutional settlement" of contested national security legal policy questions.[24]

71.     In his piece, Mr. Wittes noted that while many of the legal positions covered in

the 2016 Report had already been public, the Report had value in "bringing that material together

in a single document" and for organizing it in a way that highlighted the connections "between

issues that many observers treat in abstraction from one another." He also identified and

explained where and how the Report provided new insights to the public, calling the report

"quite simply, the most comprehensive and up-to-date elucidation of the administration's

understanding of the scope and coverage of the AUMF that's available."

72.     In addition to his work for *Lawfare*, Mr. Wittes has authored or co-authored a

number of books concerning the power of the presidency and the laws that apply to the United

States' use of military force overseas, including *Law and the Long War: The Future of Justice in*

---

[23] Lawfare, *Welcome to Lawfare* (Sept. 1, 2010), https://www.lawfareblog.com/welcome-lawfare.
[24] Benjamin Wittes, *The White House Release a "Report on the Legal and Policy Frameworks" on American Uses of Military Force*, Lawfare, Dec. 5, 2016, available at https://www.lawfareblog.com/white-house-releases-report-legal-and-policy-frameworks-american-uses-military-force.

*the Age of Terror* (2008), *Detention and Denial: The Case for Candor after Guantánamo* (2010), *The Future of Violence: Robots and Germs, Hackers and Drones—Confronting a New Age of Threat* (2015), *Speaking the Law: The Obama Administration's Addresses on National Security Law* (2015), and *Unmaking the Presidency: Donald Trump's War on the World's Most Powerful Office* (2020).

73.     Mr. Wittes's analysis of national security law has appeared in a variety of publications, including *The Atlantic*, *The Washington Post*, and *The New York Times*, as well as radio and television outlets including NBC and MSNBC.

74.     Mr. Anderson has written numerous articles concerning the Executive Branch's war powers authorities and other legal questions related to American national security, primarily for *Lawfare*, but also for other publications such as *The Washington Post*, *Foreign Policy*, *The Hill*, and *Defense One*. His analysis of national security law and policy issues is regularly cited in the national media and has appeared in the *Associated Press*, *The New York Times*, *The Wall Street Journal*, and *The Washington Post*, among other outlets. In addition, Mr. Anderson frequently provides commentary and analysis on related issues for radio and television broadcasters, including appearances on *Al Jazeera English*, *BBC*, *CBS News*, *CNN International*, *Fox News*, and *NPR*.

75.     Of particular relevance, Mr. Anderson has regularly analyzed and written about President Trump's war powers authorities, and in particular has discussed the contents of Executive Branch statements regarding its interpretations of its war powers authorities. When President Trump provided a non-public version of the prior-year report to Congress in March

2018, Mr. Anderson, along with Ms. Murphy of Plaintiff Protect Democracy, reviewed the report on Capitol Hill and were the first to report on its contents.[25]

76.     As tensions between the United States and Iran increased throughout 2019, Mr. Anderson wrote several pieces and made numerous media appearances on legal issues regarding the legal framework for the use of military force. This includes at least one circumstance in which Mr. Anderson identified an apparent—and previously unreported—change in the legal and policy framework covered by the War Powers Transparency Report for which the Trump Administration did not file a notice.[26]

77.     Following the United States' killing of Qassem Soleimani earlier this year, Mr. Anderson again wrote several pieces and gave media interviews discussing tensions between that decision and the existing legal and policy frameworks regarding the use of military force.[27] He also wrote a piece that, among other things, previewed what he expected the withheld War Powers Transparency Report to include.[28]

78.     In the wake of the Soleimani killing, Mr. Wittes and Mr. Anderson also hosted *Lawfare* podcast discussions of the legal and policy significance of the action, titled "Law and the Soleimani Strike" and "The Soleimani Strike and its Fallout."

---

[25] *See* Murphy & Anderson, *We Read the New War Powers Report.*

[26] *See* Scott R. Anderson, *Parsing the State Department's Letter on the Use of Force Against Iran*, Lawfare, July 3, 2019, available at https://www.lawfareblog.com/parsing-state-departments-letter-use-force-against-iran.

[27] *See, e.g.*, Scott R. Anderson, *The Law and Consequences of the Recent Airstrikes in Iraq*, Lawfare, Jan. 1, 2020, available at https://www.lawfareblog.com/law-and-consequences-recent-airstrikes-iraq; Scott R. Anderson, *Did the President Have the Domestic Legal Authority to Kill Qassem Soleimani?*, Lawfare, Jan. 3, 2020, available at https://www.lawfareblog.com/did-president-have-domestic-legal-authority-kill-qassem-soleimani.

[28] Scott R. Anderson & Erica Newland, *Why the Trump Administration May End Up in Court Over War Powers Reporting*, Lawfare, Feb. 28, 2020, available at https://www.lawfareblog.com/why-trump-administration-may-end-court-over-war-powers-reporting.

79.    Were President Trump to comply with his legal obligation to publish the War Powers Transparency Report, Mr. Wittes and Mr. Anderson would have *Lawfare* publish it on their website, most likely with analysis prepared by Mr. Wittes, Mr. Anderson, or other *Lawfare* contributors, and further discussion and analysis by Mr. Wittes, Mr. Anderson, and others on the *Lawfare* podcast. Mr. Wittes and Mr. Anderson would likely also receive and accept invitations to provide further analysis and thoughts on the War Powers Transparency Report in other media outlets, and/or provide analysis of the report in public discussion panels.

80.    By refusing to disclose the Executive Branch's current legal and policy frameworks for the use of force, President Trump has frustrated Mr. Wittes's and Mr. Anderson's ability to accomplish their core professional objective of understanding and educating the public about the Executive Branch's understanding of the scope of its war powers authorities.

81.    Similarly, attorneys from Protect Democracy have written multiple articles for the public, including in collaboration with Mr. Anderson and published on *Lawfare*, that analyze and explain President Trump's asserted war powers authorities.[29]

82.    Protect Democracy has also been actively seeking the release of other documents that would help strengthen public accountability of the Executive Branch's war efforts, including through ongoing litigation under the Freedom of Information Act, 5 U.S.C. § 552, for records relating to the United States' killing of Iranian Major General Qassem Soleimani,[30] and prior

---

[29] *See, e.g.*, Anderson & Newland, *Why the Trump Administration*; Murphy & Anderson, *We Read the New War Powers Report*.

[30] *See* C. Ryan Barber, *At DC's Federal Trial Court, Judges and Lawyers Grapple with Coronavirus Pandemic*, The National Law Journal, Mar. 12, 2020, available at https://www.law.com/nationallawjournal/2020/03/12/at-dcs-federal-trial-court-judges-and-lawyers-grapple-with-coronavirus-pandemic/?slreturn=20200502140031

litigation for records concerning the legal justification for the United States' airstrikes against Syria in 2017.[31]

83.     As an organization, Protect Democracy is engaging in advocacy efforts to encourage systematic war powers reform that would reassert Congress's authority in the management of American war efforts. Protect Democracy was one of twenty organizations that signed on to a cross-partisan effort to encourage Congress to effectuate the principles that the President may only take military action (broadly defined) with the authorization or approval of Congress, that the President may only act without congressional authorization in genuine emergencies, and only for a limited period of time, and that the use of national security powers must be for clearly defined purposes, subject to regular review by Congress, and only as a last resort.[32]

84.     Were the President to release the required report, Protect Democracy would disseminate it and related commentary through its website, and through its social media and email channels, which reach tens of thousands of people. Protect Democracy also anticipates that

---

(discussing oral argument in Soleimani FOIA litigation); *see also* Amended Compl., *Protect Democracy Project, Inc. v. U.S. Dep't of Justice*, No. 1:20-cv-00172 (D.D.C. Jan. 22, 2020).

[31] *See Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 296 (D.D.C. 2017) (ordering the State Department, the Defense Department, and the Justice Department to expedite their responses to FOIA requests that Protect Democracy filed after the Syria attacks); *see also* Charlie Savage, *Watchdog Group Sues Trump Administration, Seeking Legal Rationale Behind Syria Strike*, N.Y. Times, May 8, 2017, available at https://nyti.ms/2pX82OV; Justin Florence, *What's the Legal Basis for the Syria Strikes? The Administration Must Acknowledge Limits on its Power to Start a War,* Lawfare, May 8, 2017, available at https://www.lawfareblog.com/whats-legal-basis-syria-strikes-administration-must-acknowledge-limits-its-power-start-war.

[32] *See* Rebecca Kheel, *Bipartisan Groups Push Congress To 'Restore the Balance of National Security Powers,'* Politico, Feb. 24, 2020, available at https://thehill.com/policy/defense/484389-groups-push-congress-to-restore-the-balance-of-national-security-powers.

it would share such information with members of the press and publish commentary in press outlets to educate the public about the scope of war powers authorities that President Trump claims he is able to exercise absent further congressional authorization.

85.     By refusing to disclose the updated legal and policy frameworks for the use of force that the Executive Branch is following, President Trump has frustrated Protect Democracy's efforts to disseminate and comment on the report, as well as its ability to influence ongoing congressional deliberations on the President's war powers.

## CLAIMS FOR RELIEF

### Count One (Mandamus)

86.     Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if fully set forth herein.

87.     President Trump has failed to comply with his clear and nondiscretionary duty to release the War Powers Transparency Report to Congress and simultaneously to make such report available to the public, including Plaintiffs.

88.     President Trump's legal duty to release the War Powers Transparency Report is clear and undisputable.

89.     President Trump's legal duty to comply with the War Powers Transparency Requirement is further compelled by the Constitution of the United States, which requires that he "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

90.     No other adequate remedy is available to Plaintiffs to compel the legally required publication of the War Powers Transparency Report.

91.     Accordingly, Plaintiffs are entitled to issuance of a writ of mandamus directing the President to comply with his legal duty to publish the War Powers Transparency Report.

## Count Two (Declaratory Judgment)

92.     Plaintiffs repeat and incorporate by reference the foregoing paragraphs as if fully set forth herein.

93.     An actual controversy exists between Plaintiffs and the President, as Plaintiffs are harmed by the President's continuing failure to comply with his legal duty to publish the War Powers Transparency Report.

94.     Plaintiffs' injury would be partially remedied by an order declaring that the President is in violation of his legal duty to publish the War Powers Transparency Report.

95.     Pursuant to 28 U.S.C. §§ 2201–2202, Plaintiffs are entitled to a declaratory judgment that the President is in violation of his legal duty to issue the War Powers Transparency Report, 50 U.S.C. § 1549, and of the Constitution of the United States.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1.  issue a writ of mandamus directing the President to transmit to Congress and simultaneously release to the public the War Powers Transparency Report forthwith;

2.  enter an order declaring that the President is, and will continue to be, in violation of 50 U.S.C. § 1549, and the Constitution of the United States art. II, § 3, as long as he unlawfully withholds publication of the War Powers Transparency Report;

3.  award Plaintiffs' attorneys' fees and other litigation costs; and

4.  grant any other relief this Court deems appropriate.

//
//
//
//
//
//
//

Dated: June 9, 2020

Respectfully submitted,

*/s/ Nitin Shah*

Nitin Shah (D.C. Bar No. 156035)
Aman George (D.C. Bar No. 1028446)
Sean Lev (D.C. Bar No. 449936)
**DEMOCRACY FORWARD FOUNDATION**
1333 H Street NW
Washington, D.C. 20005
(202) 448-9090
nshah@democracyforward.org
ageorge@democracyforward.org
slev@democracyforward.org

*Counsel for Plaintiffs*